A05A1728. DAVENPORT v. THE STATE.

(628 SE2d 120)

BERNES, Judge.

A Coweta County jury convicted Curtis P. Davenport of one count of rape and four counts of child molestation. On appeal from the denial of his amended motion for new trial, Davenport does not contest the sufficiency of the evidence to convict him on all counts. Rather, he contends that the trial court committed plain error by allowing two of the State's witnesses to provide improper opinion testimony about the truthfulness of the victim. Davenport also argues that his trial counsel was constitutionally ineffective on several grounds. Finding no reversible error, we affirm.

Viewed in the light most favorable to the verdict, the evidence presented at trial shows that on December 2, 2002, Davenport pled guilty under *North Carolina v. Alford*, 400 U. S. 25 (91 SC 160, 27 LE2d 162) (1970) to two counts of child molestation for molesting his nine-year-old stepdaughter, T. C. Davenport was sentenced to ten years, with two months served in confinement and the remainder of the sentence served on probation. As part of his probation, Davenport was forbidden from having unsupervised contact with T. C.

Within three weeks after he was released from jail, Davenport violated his probation and had unsupervised contact with T. C. One night, Davenport went to the home where T. C. was living. T. C., her mother, and her brother were sleeping in the living room. Davenport entered the home, awakened T. C., and told her to go to her brother's

bedroom. Davenport told T. C., "I want to look at you" and offered her $50 to take off her clothes. After T. C. undressed, Davenport touched her between her legs and on her chest, placed his penis "in between the sides" of her vagina "[a] little bit," and ejaculated on her body. Davenport then told her to go clean herself up.

T. C. thereafter moved to a new address. Following the move, Davenport came by T. C.'s home every day. One night, Davenport went into the bedroom where T. C. and her brother were sleeping. Davenport awakened T. C. and persuaded her to go into the bathroom with him by telling her that he would finally buy her a computer. Once they were alone in the bathroom, Davenport "did the same thing he did the first time," including placing his penis on her vagina and ejaculating on her.

A few days later, Davenport again visited T. C. at her new home. It was very early in the morning, and T. C. and her seven-year-old brother had sneaked downstairs to heat up some food and watch a movie. Davenport entered the home and sent T. C.'s brother to bed. T. C. then attempted to go to bed along with her brother, but Davenport went into the bedroom where T. C. and her brother were lying down. Davenport ordered T. C.'s brother to cover his head, and he whispered to T. C. that if she would go to the bathroom and undress, he would buy her some new clothes. When T. C. declined, Davenport left the bedroom. However, later that morning, Davenport reentered the bedroom and ordered T. C.'s brother to go outside and clean the trunk of the car. Once alone with T. C., Davenport touched her the "[s]ame as the first and second time," caused "a little bit" of his penis to "go inside" her vagina, and ejaculated on her.

Subsequently, T. C.'s brother told the children's long-time babysitter, Marilyn Talbert, that Davenport had come over to his house late at night, caught T. C. and him heating up food and getting ready to watch a movie, and ordered him to go to bed. He told Ms. Talbert that after T. C. followed him up to the bedroom and they both lay down in bed, Davenport came into the bedroom, told him to cover his head with the covers, and whispered something into T. C.'s ear. Based on what she learned from T. C.'s brother, and given her knowledge about Davenport's previous indictment for child molestation, Ms. Talbert asked T. C. about what had happened. T. C. became upset and started to cry, told Ms. Talbert that "he did it again," and described to her the incidents of molestation that had occurred since Davenport had been released from jail. Based on what she learned, Ms. Talbert contacted the Department of Family and Children Services.

Davenport was arrested and indicted for rape and child molestation. At trial, the trial court permitted the State to introduce evidence of Davenport's previous guilty plea on the two counts of child

molestation committed against T. C. The State called multiple witnesses, including T. C., who testified in graphic detail about the incidents of sexual abuse that had occurred after Davenport was released from jail. The State also called T. C.'s brother, who testified about what he observed on the night that T. C. and he were attempting to watch a late night movie.

Ms. Talbert, the children's babysitter and current custodian, testified on behalf of the State as well. She related what T. C. and her brother had told her about the incidents at issue. Ms. Talbert further testified that T. C. suffered from insomnia, had trouble controlling her anger, and had problems with wetting herself multiple times throughout the day and night, problems that had begun to subside the first time that Davenport went to jail, reappeared upon his release, and once again began to subside after his arrest in this case.

The State also presented evidence that T. C. had described Davenport as having grey pubic hair and bumps on his penis. Her description was confirmed by a law enforcement officer who physically examined Davenport. When he took the stand in his own defense, Davenport himself conceded that T. C.'s physical description of his genitalia was accurate.

Finally, the State called two expert witnesses: Roberta Leinweber, a certified pediatric nurse practitioner with Children's Health Care of Atlanta who specializes in medically evaluating sexually abused children, and Dr. Julie Medlin, a licensed psychologist who specializes in evaluating and treating sexual abuse victims and perpetrators. Nurse Leinweber testified that while her physical examination of T. C. did not reveal any physical signs of sexual abuse, the lack of physical findings was entirely consistent with the allegations of slight penetration made by T. C. Dr. Medlin testified that she conducted a battery of psychological tests, and T. C. scored high in categories indicating that she suffered from sexual fears and high emotional distress, had an unusually high level of sexual preoccupation, and exhibited atypical sexual behaviors for her pre-adolescent age group, among other things.

1. Davenport first contends that the trial court committed plain error by allowing the State to elicit testimony from Nurse Leinweber and Dr. Medlin that constituted an improper comment upon T. C.'s truthfulness and bolstered her credibility.

Plain error is error that is so clearly erroneous as to result in a likelihood of a grave miscarriage of justice or one that seriously affects the fairness, integrity, or public reputation of a judicial proceeding. Although our Supreme Court has restricted application of the plain error doctrine to death penalty cases and cases in which the court has allegedly

opined on the guilt of the defendant, this court's application of the doctrine has been less restrictive. We have, however, generally restricted application of the doctrine to cases presenting exceptional circumstances.

(Citation omitted.) *In the Interest of M. F.*, 276 Ga. App. 402, 404 (2) (623 SE2d 234) (2005). The alleged error in this case "was simply the admission of evidence bolstering a witness's credibility. This is not the kind of error that seriously affects the fairness, integrity, or public reputation of a judicial proceeding." (Footnote omitted.) *Horne v. State*, 262 Ga. App. 604, 606 (1) (586 SE2d 13) (2003). See also *Rogers v. State*, 247 Ga. App. 219, 226-227 (9) (543 SE2d 81) (2000). Furthermore, no grave miscarriage of justice will result even if the comments by the State's expert witnesses were improper. As we explain in detail infra in Division 2 (a) and (b), it is highly probable that the comments did not contribute to the jury's verdict. See *Horne*, 262 Ga. App. at 606 (1). Hence, we decline to apply the plain error doctrine in this case.

2. Davenport argues that the trial court should have concluded that he received ineffective assistance from his trial counsel on several grounds. Davenport contends that his trial counsel was ineffective because he (a) did not object to opinion testimony of Nurse Leinweber that allegedly bolstered T. C.'s credibility; (b) did not object to purportedly similar bolstering testimony offered by Dr. Medlin; (c) did not object to testimony of Ms. Talbert that allegedly bolstered the credibility of T. C.'s brother; (d) did not object to the State's references to Davenport's prior indictment, arrest, guilty plea, incarceration, conditions of probation, and probation violations; and (e) did not object to leading questions posed by the State to T. C.

"Because Georgia does not recognize the cumulative error doctrine, we will discuss each claim of ineffective assistance separately." (Citation omitted.) *Fitz v. State*, 275 Ga. App. 817, 824-825 (4) (622 SE2d 46) (2005). To succeed on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984), a criminal defendant must prove (1) that his trial counsel's performance was deficient, and (2) "that counsel's deficiency so prejudiced his defense that a reasonable probability exists that the result of the trial would have been different but for that deficiency." (Citation and punctuation omitted.) *Mency v. State*, 228 Ga. App. 640, 642 (2) (492 SE2d 692) (1997). "[A] court need not determine whether trial counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiency." (Footnote omitted.) *Walker v. State*, 268 Ga. App. 669, 673 (4) (a) (602 SE2d 351) (2004). We will not reverse a trial court's findings regarding either the deficiency or prejudice prong of

the *Strickland* test unless clearly erroneous. *Rose v. State*, 258 Ga. App. 232, 234-235 (2) (573 SE2d 465) (2002).

(a) Davenport argues that his trial counsel should have objected when Nurse Leinweber testified during her direct examination that the findings of her physical examination of T. C. were "absolutely consistent with this victim's story." Davenport contends that Nurse Leinweber's opinion testimony constituted improper bolstering of T. C.'s credibility. "It is true that the credibility of a witness is a matter for the jury, and a witness' credibility may not be bolstered by the opinion of another witness as to whether the witness is telling the truth." (Footnote omitted.) *Branesky v. State*, 262 Ga. App. 33, 36 (3) (a) (584 SE2d 669) (2003). However, Nurse Leinweber's testimony was not improper.

This Court has held that "[a]lthough an expert witness may not testify as to his opinion of the victim's truthfulness, the witness may express an opinion as to whether medical or other objective evidence in the case is consistent with the victim's story." (Citation and punctuation omitted.) *Satterwhite v. State*, 212 Ga. App. 543, 543-544 (2) (442 SE2d 5) (1994). See also *Odom v. State*, 243 Ga. App. 227 (1) (531 SE2d 207) (2000); *State v. Oliver*, 188 Ga. App. 47, 51 (2) (372 SE2d 256) (1988). Thus, there was no error in the trial court allowing this testimony or in trial counsel's decision not to object, and, as a result, no basis for an ineffective assistance claim. See *Biswas v. State*, 255 Ga. App. 339, 346 (6) (b) (565 SE2d 531) (2002) ("Failure to make a meritless objection is not evidence of ineffective assistance of counsel.") (citation omitted).

Although not set forth in his enumerations of error, Davenport also claims that his trial counsel should have objected to Nurse Leinweber's opinion testimony because "she relied upon law enforcement reports and did not personally interview the victim in making her determination that the victim had been penetrated by the Appellant." However, "under Georgia law, it is well settled that an expert may rely on hearsay as well as reports of others in formulating [her] opinions." *In the Interest of J. P.*, 253 Ga. App. 732, 737 (560 SE2d 318) (2002). Furthermore, the record clearly reflects that Nurse Leinweber's testimony was largely predicated on her own physical examination of T. C. "When an expert's opinion is based in part on hearsay and in part on present observation, the testimony may be admitted and the expert's lack of personal knowledge merely presents a jury question about the weight to be accorded the expert's opinion. *Leonard v. State*, 269 Ga. 867 (506 SE2d 853) (1998)." *Bagwell v. State*, 270 Ga. 175, 178 (1) (b) (508 SE2d 385) (1998). Hence, Davenport's claim is without merit.

(b) Davenport also asserts that two statements made by Dr. Medlin improperly bolstered T. C.'s credibility. Each statement will

be discussed in turn, since "any error of record must stand or fall on its own merits and is not aided or aggravated by the accumulative effect of other claims of error." (Citations omitted.) *Gosnell v. State*, 247 Ga. App. 508, 510 (2) (c), n. 13 (544 SE2d 477) (2001).

(i) During her direct examination, the State asked Dr. Medlin about what criteria she uses when conducting a forensic interview to determine whether a child is making false allegation of sexual abuse. After Dr. Medlin listed several criteria, the State asked, "And in this case did you see any signs of false allegations?" Dr. Medlin replied, "No, I did not." Davenport argues that his trial counsel should have objected to Dr. Medlin's comment on the ground that it constituted improper bolstering.

Based on our review of the record as a whole, we conclude that, even if Dr. Medlin's comment constituted improper bolstering, Davenport has failed to prove that the comment so prejudiced his defense as to affect the outcome of his trial. See *Gosnell*, 247 Ga. App. at 510-511 (2) (c), 512 (3). The comment at issue consisted of no more than a few lines of testimony that occurred during the course of a three-day jury trial with multiple witnesses. Nor is there anything in the record indicating that the State called special attention to this testimony or otherwise emphasized it as part of its theory of the case.

In turn, T. C.'s account of the sexual abuse remained consistent when she repeated it to several interviewers and when she testified at trial. In addition to being consistent, her account included graphic descriptions of sexual acts, including ejaculation, which lent credibility to her description of what had occurred.

Other evidence, previously discussed, also strongly supported T. C.'s account of sexual abuse. First, the testimony of T. C.'s brother corroborated T. C.'s account concerning the third instance of sexual abuse. Second, T. C.'s account included an unusual physical description of Davenport's genitalia that was confirmed by a law enforcement officer and by Davenport himself. Third, T. C.'s account was supported by the testimony of Ms. Talbert that T. C. suffered from anger management problems, insomnia, and problems with wetting herself that manifested themselves during the times of the alleged abuse but then subsided at the times when Davenport was no longer present. Fourth, T. C.'s account was consistent with her high scores in certain categories of the psychological tests administered by Dr. Medlin and did not conflict with Nurse Leinweber's physical examination. Fifth, and finally, T. C.'s account was supported by the evidence of prior difficulties introduced by the State showing that less than a year earlier, Davenport pled guilty to two counts of molesting T. C.

Conversely, Davenport had a full opportunity to extensively test T. C.'s memory and credibility during cross-examination. Moreover,

he was able to present evidence that mitigated any potential negative effect of the allegedly improper testimony. In particular, Davenport presented his own expert psychologist who attempted to establish that Dr. Medlin's psychological examination, analysis, and conclusions were incomplete because there were lines of inquiry that Dr. Medlin had chosen not to pursue with T. C. during the course of her forensic interview.

Under these circumstances, there is no reasonable likelihood that the results of the trial would have been different absent the allegedly improper testimony. See *Gosnell*, 247 Ga. App. at 510-511 (2) (c), 512 (3); *Crider v. State*, 246 Ga. App. 765, 769-770 (4) (a) (542 SE2d 163) (2000); *Buice v. State*, 239 Ga. App. 52, 56 (2), 60 (6) (a) (520 SE2d 258) (1999); *Moss v. State*, 216 Ga. App. 711, 714 (5) (455 SE2d 411) (1995). The trial court properly denied Davenport's claim of ineffective assistance.

(ii) At the end of her direct examination, the State asked Dr. Medlin, "[H]ave you done any research, read any studies about false allegations and their percentages?" Dr. Medlin replied, "Yes. There is actually a lot of research on this question in the field and the research shows that among the age group that [T. C. is] in[,] that the rates of false allegations are very low, that it's only about four percent." Davenport claims that Dr. Medlin's reference to statistical data constituted improper bolstering of T. C.'s credibility to which his trial counsel should have objected.

We reject Davenport's claim. As an initial matter, the record reflects that Davenport's trial attorney did in fact object to the testimony. Thus, Davenport cannot establish that his trial counsel was deficient. See *Cupe v. State*, 253 Ga. App. 851, 855 (3) (a) (560 SE2d 700) (2002). Furthermore, even assuming deficient performance by trial counsel, Davenport cannot establish the prejudice prong of the *Strickland* test for all the reasons discussed in Division 2 (b) (i). We also note that the defense's expert offered his own competing statistical data and attempted to call into question the validity of the specific statistical data referenced by Dr. Medlin, further mitigating the potential risk that Dr. Medlin's comment had any impact on the jury's decision making. Accordingly, Davenport has failed to establish his ineffective assistance claim.

(c) Davenport next argues that his trial counsel was ineffective because he did not object to Ms. Talbert's testimony about a statement made to her by T. C.'s brother. During her direct examination, Ms. Talbert related what T. C.'s brother told her about the night that Davenport came over as T. C. and her brother were getting ready to watch a late night movie. Because Ms. Talbert testified before T. C.'s brother and before any allegation by the defense that his testimony had been fabricated, Davenport contends that what T. C.'s brother

told Ms. Talbert was not admissible as a prior consistent statement. See *Woodard v. State*, 269 Ga. 317, 320 (2) (496 SE2d 896) (1998). As such, Davenport asserts that his trial counsel should have objected to the testimony as inadmissible hearsay that improperly bolstered the credibility of T. C.'s brother.

We cannot agree. Ms. Talbert's testimony concerning the statement made to her by T. C.'s brother was admissible under the authority of OCGA § 24-3-2, irrespective of whether it met the test for admission as a prior consistent statement.

> In *Momon v. State*, 249 Ga. 865, 867 (294 SE2d 482) (1982), [the Supreme Court of Georgia] stated a rule for applying OCGA § 24-3-2; if the conduct and motives of the actor are relevant to the issues on trial, then information, conversations, letters and replies, and similar evidence known to the actor are admissible to explain the actor's conduct.

*Hampton v. State*, 272 Ga. 284, 286 (4) (527 SE2d 872) (2000). Ms. Talbert's conversation with T. C.'s brother was admissible to explain why she later approached T. C. and asked her about her contact with Davenport, an issue relevant under the particular facts of this case.

The defense's theory of the case was that Ms. Talbert and T. C.'s mother conspired together to set Davenport up and to have T. C. make false allegations of rape and molestation, in order to get revenge for the fact that Davenport had cheated on T. C.'s mother and had treated her poorly. As part of this theory, the defense called attention to the fact that the first person that T. C. spoke to about the new incidents of molestation was Ms. Talbert, who had approached T. C. about the issue and had "prodded" her for information.

Given these circumstances, the admission of Ms. Talbert's conversation with T. C.'s brother was relevant because her motives for speaking with T. C. about her relationship with Davenport were placed at issue at trial. The conversation served the purpose of showing why Ms. Talbert had approached T. C. in the first instance and sought information from her. The conversation, if believed by the jury, dispelled any insinuation that Ms. Talbert had approached T. C. and pressed her about her contact with Davenport as part of any effort to frame him. For this reason, Ms. Talbert's testimony about what T. C.'s brother told her was admissible, and an objection aimed at excluding the testimony would have been unavailing. Thus, Davenport cannot establish the deficiency prong of the *Strickland* test.

(d) Davenport claims that his trial counsel was ineffective because he did not object when the State introduced documentary evidence and elicited testimony concerning his indictment, arrest,

guilty plea, incarceration, terms of probation, and probation violations associated with the prior charges of child molestation. He claims that this evidence and testimony improperly introduced his character into the proceedings and was highly prejudicial.

Davenport's claim lacks merit. "[E]vidence of the defendant's prior acts toward the victim[,] be it a prior assault, a quarrel, or a threat[,] is admissible when the defendant is accused of a criminal act against the victim." (Punctuation and footnote omitted.) *Cunningham v. State*, 243 Ga. App. 770, 771 (1) (533 SE2d 735) (2000). So long as a proper limiting instruction is given (as it was in this case on several occasions), evidence of such "prior difficulties" between the defendant and victim "may be considered more broadly than evidence of a similar transaction" and "is admissible to show the defendant's intent, bent of mind, and course of conduct. Such evidence may be admitted to show a continuing pattern of conduct in committing [a criminal offense] upon the victim." (Citation, punctuation and emphasis omitted.) *Hall v. State*, 255 Ga. App. 631, 635 (4) (a) (566 SE2d 374) (2002).

Based on these principles, it is clear that evidence and testimony pertaining to Davenport's prior acts of child molestation committed against T. C. were admissible to show bent of mind and "a continuing pattern of conduct in committing [sexual abuse] upon the victim." *Hall*, 255 Ga. App. at 635 (4) (a). Hence, the trial court properly admitted evidence and testimony of Davenport's prior indictment and guilty plea on this ground.

Given the proper introduction of this prior difficulties evidence, any reference to the additional fact that Davenport had been arrested and spent time in jail for the prior offense at most only incidentally placed his character at issue. The jury surely would have assumed that Davenport had been arrested and spent time in jail on the two counts of child molestation to which he pled guilty, even if they had not been explicitly told so. Thus, testimony that Davenport had been in jail was not unduly prejudicial or otherwise improper since it "did not tell the jury anything it did not already know about [Davenport]." *Roberts v. State*, 212 Ga. App. 607, 608 (2) (443 SE2d 4) (1994). See also *Waldrip v. State*, 267 Ga. 739, 748 (11) (482 SE2d 299) (1997).

Nor was it improper for the trial court to allow testimony about the conditions of Davenport's probation and his violation of the same. Evidence of the conditions of a defendant's probation, and a defendant's violation of those conditions, are admissible when relevant to an issue in the case, even if they incidentally put the defendant's character in issue. See, e.g., *Dickerson v. State*, 273 Ga. App. 499, 501 (2) (615 SE2d 584) (2005); *Terrell v. State*, 271 Ga. 783, 787-788 (7) (523 SE2d 294) (1999); *Waldrip*, 267 Ga. at 748 (11). Such evidence was relevant under the circumstances here.

Davenport testified that he pled guilty to the prior molestation charges even though he was innocent and believed he was being framed, because he did not want to do anything that would risk putting him back in prison, such as risk a guilty verdict in a criminal trial. As such, the State was entitled to introduce evidence of the conditions of his probation, and his consistent violation of those conditions, which called into question Davenport's motive for pleading guilty, namely, his fear of doing anything that would lead to further prison time. Furthermore, the fact that Davenport violated his probation by having unsupervised contact with T. C. was relevant because it was inconsistent with his alleged fear that he was being framed all along by T. C., and the State was entitled to call attention to this inconsistency.

For the foregoing reasons, the trial court did not err in allowing the State to introduce the complained-of evidence. Davenport cannot establish that his trial counsel was deficient by failing to object to its introduction.

(e) Finally, Davenport contends that his trial counsel was ineffective because he did not object to numerous leading questions posed to T. C. by the State. At the motion for new trial hearing, Davenport's trial counsel testified that it was part of his trial strategy not to object to too many of the leading questions because he believed it would unduly emphasize the victim's testimony to the jury: "I really don't want it to be asked twice. One, with the leading question, I object, and then counsel corrects it, and the jury hears it twice." This strategy of objecting selectively is borne out by the fact that during T. C.'s testimony, trial counsel at times did object to certain leading questions asked by the State.

As we have repeatedly held, "[d]ecisions as to whether to interpose certain objections fall within the realm of trial tactics and strategy and usually provide no basis for reversal of a conviction." *Smith v. State*, 261 Ga. App. 871, 877 (5) (a) (583 SE2d 914) (2003). Given the explanation provided by Davenport's trial counsel for why he chose not to object, we conclude that Davenport cannot establish that his trial counsel acted in a deficient manner. See *Reynolds v. State*, 269 Ga. App. 268, 271 (2) (603 SE2d 779) (2004) (concluding that defense counsel was not ineffective when he declined to object to leading questions); *Smith*, 261 Ga. App. at 877 (5) (a) (same).

*Judgment affirmed. Blackburn, P. J., and Miller, J., concur.*

DECIDED FEBRUARY 22, 2006 —
RECONSIDERATION DENIED MARCH 7, 2006.

*Dwight L. Thomas*, for appellant.

*Peter J. Skandalakis, District Attorney, Bruce P. Dutcher, Raymond C. Mayer, Assistant District Attorneys*, for appellee.